1

2

3

4                           UNITED STATES DISTRICT COURT

5                          NORTHERN DISTRICT OF CALIFORNIA

6

7    USA,                                        Case No.  20-cr-00120-HSG-1

8              Plaintiff,                         **ORDER DENYING MOTION TO
                                                  SUPPRESS EVIDENCE**
9         v.
                                                  Re: Dkt. No. 28
10   DANIEL ANDRES SCALLION-
     MARTINEZ,
11
               Defendant.
12

13        Pending before the Court is Defendant Daniel Andres Scallion-Martinez's ("Defendant")

14   motion to suppress (Dkt. No. 28, "Motion"), for which the briefing is complete.  Dkt. No. 30

15   ("Opp."); Dkt. No. 37 ("Reply").  On July 24, 2020, the Court held a hearing on the Motion.  Dkt.

16   No. 39.  For the reasons set forth below, the Court **DENIES** the Motion.

17   **I.    BACKGROUND**

18        On January 14, 2020, at approximately 8:14 p.m., San Pablo Police Department ("SPPD")

19   received a call, from a person identifying herself as "Vanessa," reporting that a black two-door

20   sedan parked across the street from 1931 Mesa Buena Ave, San Pablo, California was

21   "suspicious," and that the two occupants were possibly smoking marijuana.  *See* Declaration of

22   John Paul Reichmuth in Support of Motion to Suppress (Dkt. No. 28-1, "Reichmuth Decl."), Ex.

23   A at 134, 137.  Vanessa provided only her first name, but also provided a telephone number and

24   location.  *See* Declaration of Manuel Agredano in Support of Memorandum in Opposition (Dkt.

25   No. 32, "Agredano Decl.") ¶¶ 5, 11.  The call terminology was "suspicious … possibly doing HS

26   … which is shorthand for use of narcotics."  *Id.* ¶ 11 (internal quotations omitted).  SPPD officers

27   Manuel Agredano and Kristina Foster responded to the dispatch, and observed a black Toyota

28   Corolla parallel parked at a curb with two occupants.  Reichmuth Decl. Ex. A at 130, 134.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Officer Agredano parked his marked police car in the middle of the street—at an angle—

2  directly in front of the Corolla, and shined the police car's spotlight into it.  Agredano Decl. ¶ 12.

3  The car was blocked by the curb/sidewalk on one side, by another parked car behind it, and by the

4  police car in front of it.  Reichmuth Decl. Ex. B. at 00:25.  Officer Agredano questioned the car's

5  two occupants and asked for their identification.  *Id.* Ex. A at 130, 134.  The front passenger was

6  later identified as the Defendant.  *Id.*  Using a flashlight to look into the front passenger

7  compartment, Officer Foster observed what appear to be a firearm under the passenger floorboard

8  where Defendant was sitting.  *Id.*  A firearm containing a magazine was then recovered from the

9  front passenger floorboard.  *Id.*

10    On March 5, 2020, Defendant was indicted for one count of felon in possession of

11  ammunition, in violation of 18 U.S.C. § 922(g).  Dkt. No. 11. [1]

12  **II.    LEGAL STANDARD**

13    The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

14  houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. Amend. IV.

15  The exclusionary rule protects this right by permitting a criminal defendant to move to suppress

16  evidence that was obtained in violation of his Fourth Amendment rights.  *United States v.*

17  *Calandra*, 414 U.S. 338, 347–48 (1974).  It acts as a deterrent, "to compel respect for the

18  constitutional guaranty in the only effectively available way—by removing the incentive to

19  disregard it."  *Id.* at 347 (quotation omitted).

20    The exclusionary rule "reaches not only primary evidence obtained as a direct result of an

21  illegal search or seizure, but also evidence later discovered and found to be derivative of an

22  illegality or 'fruit of the poisonous tree.'"  *United States v. Pulliam*, 405 F.3d 782, 785 (9th Cir.

23

24  [1] Defendant contends that an evidentiary hearing is necessary to resolve three questions:
"[w]hether the tipster called an emergency or non-emergency line," "[w]hether the tipster

25  complained of the vehicle's occupants 'possibly using narcotics' or 'smoking marijuana,'" and
"[w]hether the vehicle was blocked from forward progress."  Reply at 9.  The Court finds that no

26  evidentiary hearing is required as to any of these issues.  The government agreed at the hearing on
the Motion that there is no dispute that the call was made on a non-emergency line.  As discussed

27  below, the Court finds that the record establishes beyond reasonable dispute that the officers
blocked the forward progress of the car in which Defendant was a passenger.  And as also

28  discussed below, the Court need not resolve the "narcotics" versus "marijuana" dispute, because
the Court finds that the officers had reasonable suspicion to seize the car under either scenario.

1    2005) (quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).  The government bears the

2    burden of proving that a warrantless search or seizure falls within an exception to the warrant

3    requirement.  *United States v. Scott*, 705 F.3d 410, 416–17 (9th Cir. 2012).

4    **III.    DISCUSSION**

5           The government must prove that the officers either (1) did not seize the Defendant or the

6    Corolla, or (2) had reasonable suspicion that criminal activity was ongoing.

7           **A.     The Officers Seized the Corolla**

8           Defendant contends that the officers seized the Corolla when Officer Agredano parked his

9    police car in the middle of the street, at an angle in front of the car, and shined a spotlight into it.

10   Mot. at 3.  The government disagrees, characterizing the interaction as "a consensual encounter

11   that did not rise to the level of a seizure under the Fourth Amendment."  Opp. at 11.  The Court

12   finds that the totality of the circumstances establish that there was a seizure of the car.

13          "[I]n order to determine whether a particular encounter constitutes a seizure, a court must

14   consider all the circumstances surrounding the encounter to determine whether the police conduct

15   would have communicated to a reasonable person that the person was not free to decline the

16   officers' requests or otherwise terminate the encounter."  *Florida v. Bostick*, 501 U.S. 429, 434

17   (1991); *see also United States v. Al Nasser*, 555 F.3d 722, 727–29 (9th Cir. 2009).  Here, the

18   government appears to dispute that the car in which Defendant was a passenger was blocked by

19   the police car in the front.  Opp. at 3 (citing Agredano Decl. ¶ 12).  The following screenshots

20   from the bodycam footage of the officers show the relative positioning of the police car and the

21   Corolla, and the area ahead of the passenger side of the Corolla:

United States District Court
Northern District of California

1





Reichmuth Decl. Ex. B. at 00:25; Declaration of Kristina Foster (Dkt. No. 33, "Foster Decl.") ¶¶ 10-11.

In light of these undisputed facts, the government contends that the car could have exited by "moving forward," likely by driving partially on the sidewalk. Opp. at 3. Applying the above standard, the issue is whether a reasonable person in Defendant's position would have felt free to

United States District Court
Northern District of California

1    terminate the encounter with the officers, when a marked police car was in front of the Corolla,

2    shining a spotlight into it, and when the options for leaving were either to (1) get out of the car and

3    walk away or (2) urge the driver to leave by driving away partially on the sidewalk/curb.

4        The government relies primarily on *United States v. Kim*, 25 F.3d 1426, 1427 (9th Cir.

5    1994), where federal agents approached a defendant who was seated in a car parked on a public

6    street.  There, one of the agents parked an unmarked police car in a way that only partially blocked

7    the defendant's car from leaving.  *Id*.  That agent approached the defendant's car, identified

8    himself, and asked whether he could ask some questions.  *Id*.  The agent asked the defendant and

9    the other occupant of the car to step out of the car for further questioning, and asked for and

10   received permission to search a suitcase and the defendant's pocket.  *Id.* at 1427–29.  On these

11   facts, the Ninth Circuit concluded that "the contact between DEA agents and Kim . . . did not rise

12   to the level of an investigatory stop."  *Id*. at 1430.  The Ninth Circuit noted that "[a]bsent indicia

13   of force or aggression, a request for identification or information is not a seizure or investigatory

14   stop."  *Id*.

15       The Ninth Circuit further reasoned that because the agent was "not uniformed or visibly

16   armed," he would have been "unlikely in this respect to emanate to any unduly intimidating extent

17   the authority to detain the suspect, with or without his consent."  *Id*. at 1430, n.1.  Notably, the

18   court in *Kim* did not discuss or make a finding as to whether the car was seized.  *Id.*  In fact, it

19   appears that the Ninth Circuit distinguished the question of whether the individual defendant was

20   seized outside the vehicle from the question of whether the vehicle itself was seized.  *See id*. at

21   1431 n.2 ("Even if Agent Aiu had more completely blocked the departure of Kim's automobile,

22   Kim enjoyed greater latitude during his initial conversations with Agent Aiu to depart, even if on

23   foot, than that enjoyed by the more closely hemmed-in suspect whom, approached from two sides

24   with his back against a pillar inside an airport terminal, we deemed not to have been stopped in

25   *[U.S. v.] $25,000 U.S. Currency*.") (internal citations omitted).

26       Similarly, the government relies on *United States v. Summers*, 268 F.3d 683 (9th Cir.

27   2001), where officers observed the defendant near (but outside of) his parked car, and the officers

28   parked their car perpendicular to the defendant's car without blocking the rearward exit path of the

1   car. The officer also approached "without activating his lights or siren." *Id.* When defendant told

2   officers that he did not have any identification, the officer asked if defendant had paperwork in his

3   car confirming his identity, and the defendant returned to his car and sat down in the driver's seat.

4   The officer followed the defendant to the driver's side of the car, and observed a firearm while

5   illuminating the interior of the car with his police flashlight out. The Ninth Circuit concluded that

6   this interaction did not rise to the level of an investigatory stop, and restated that "[w]hen an

7   encounter is voluntary, no constitutionally protected right is implicated." *Id*. at 686–87. The

8   officer there only asked defendant for identification and then pursued follow-up questions in order

9   to identify the defendant. *Id*. The court determined that "[t]hese facts support the conclusion that

10   the interaction was voluntary, not coerced." *Id.* at 687.

11   Last, the government relies on *United States v. Washington*, 490 F.3d 765 (9th Cir. 2007),

12   where the defendant was lawfully parked, and a single uniformed and armed police officer

13   "parked his squad car a full car length behind Washington's car so he did not block it" and "did

14   not activate his sirens or lights." *Id*. at 770. The officer later searched the defendant's car, where

15   he found a firearm. *Id*. In analyzing this interaction, the Ninth Circuit again observed that it is

16   "well established . . . that the Fourth Amendment is not implicated when law enforcement officers

17   merely approach an individual in public and ask him if he is willing to answer questions." *Id*. at

18   770. Because the officer did not block the defendant's car from leaving, and did not activate his

19   lights or siren, the court determined that "a reasonable person would have felt free to terminate the

20   encounter and leave." *Id*.

21   The government's cases make clear that officers have a number of ways to approach an

22   individual in a parked car that will not amount to a seizure. The Court finds, however, that the

23   government's cases are distinguishable on their facts, and do not preclude the Court from finding a

24   seizure here, where the Corolla was blocked from leaving while uniformed officers shined the

25   spotlight from a marked police car into it. Defendant's cited cases persuasively highlight that a

26   vehicle is seized when a police car is face-to-face in front of it and shining a spotlight into it. For

27   example, in *United States v. Alvarado*, the Ninth Circuit found that officers seized a vehicle "when

28   they simultaneously parked their marked patrol cars perpendicular to the [vehicle the defendant]

United States District Court
Northern District of California

occupied and shone their spotlights into the car." 763 F. App'x 609, 610-11 (9th Cir. 2019).[2]  The

position of the officers' parked patrol car and the use of their spotlights, "which would affect

[defendant's] vision, likely restricted [defendant's] ability to leave."  *Id.*

Similarly, in *United States v. Nunn*, the court found that when police officers parked

behind a defendant's vehicle in a way that blocked it between the curb in front of it and the patrol

car behind it, the officers terminated the vehicle's freedom of movement, and therefore seized it.

No. 14–cr–636, 2015 WL 3764181, at *4 (N.D. Cal. June 16, 2015).  And in *United States v.*

*Harger*, the court held that police officers seized a van when they deliberately parked their vehicle

perpendicular to the back of the van and blocked it from leaving.  313 F. Supp. 3d 1082, 1087-88

(N.D. Cal. 2018).  There, the court noted that the officers "entirely barred [defendant's] van from

moving and did not indicate in any way that [defendant] or his van could leave."  *Id.* at 1088.

The Court concludes that when the uniformed police officer here parked a marked police

cruiser in a way that restricted the ability of the Corolla to exit in a reasonable manner, the officers

seized the car (and its occupants).  One need only turn on a television or open a newspaper for a

reminder that people in this country, and particularly people of color, can be shot while walking

away, let alone driving on the sidewalk, during encounters with armed officers.  No reasonable

person in Defendant's position would have felt free to leave or terminate the encounter on the

undisputed facts here, and the Defendant was seized for Fourth Amendment purposes.

**B.    The Officers Had Reasonable Suspicion to Seize the Corolla**

Having found that a seizure occurred, the Court next addresses whether the officers had

reasonable suspicion for that seizure.

"The Fourth Amendment permits brief investigative stops when a law enforcement officer

has reasonable suspicion that the person stopped is engaged in criminal activity."  *United States v.*

*Williams*, 846 F.3d 303, 308 (9th Cir. 2017).  An investigative detention of a car is "akin to the on

the street encounters addressed in *Terry v. Ohio*" so as to require reasonable suspicion.  *United*

---

[2] As an unpublished Ninth Circuit decision, *Alvarado* and the other unpublished cases cited in this order are not precedent, but may be considered for their persuasive value.  *See* Fed. R. App. P. 32.1; CTA9 Rule 36-3.

United States District Court
Northern District of California

1    *States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006).  "Reasonable suspicion requires more

2    than a mere 'hunch' of wrongdoing, but the degree of proof needed is 'considerably less than

3    proof of wrongdoing by a preponderance of the evidence,' and 'obviously less demanding than

4    that for probable cause.'"  *Williams*, 461 F.3d at 308 (citation omitted).  Whether reasonable

5    suspicion exists "depends on the totality of the circumstances surrounding the stop, including

6    'both the content of information possessed by police and its degree of reliability.'"  *Id.* (citation

7    omitted).  The Ninth Circuit has recently acknowledged "the Supreme Court's warning against

8    'excessively technical dissection of the factors supporting' reasonable suspicion."  *United States v.*

9    *Delaney*, 955 F.3d 1077, 1087 (9th Cir. 2020) (*quoting District of Columbia v. Wesby*, 138 S. Ct.

10   577, 588 (2018)); *see also United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013)

11   (explaining that "[r]easonable suspicion is a 'commonsense, nontechnical conception[ ] that

12   deal[s] with the factual and practical considerations of everyday life on which reasonable and

13   prudent men, not legal technicians, act.'") (citations omitted).

14         Where, as here, the seizure is based on a telephone tip, the Court must focus on whether

15   the tip has "sufficient indicia of reliability to provide reasonable suspicion to make an

16   investigatory stop."  *Williams*, 846 F.3d at 308 (citation omitted).  The Supreme Court and the

17   Ninth Circuit have considered a number of factors relevant to reliability, including whether the

18   tipper is identified, rather than anonymous, *Florida v. J.L.*, 529 U.S. 266, 270 (2000); whether the

19   tipper reveals the basis of her knowledge, *United States v. Rowland*, 464 F.3d 899, 908 (9th Cir.

20   2006); whether the tipper provides detailed predictive information indicating insider knowledge,

21   *id.*; whether the caller uses a 911 number rather than a non-emergency tip line, *Foster v. City of*

22   *Indio*, 908 F.3d 1204, 1214 (9th Cir. 2018); and whether the tipster relays recent, eyewitness

23   knowledge, rather than dated, second-hand knowledge, *United States v. Terry-Crespo*, 356 F.3d

24   1170, 1176–77 (9th Cir. 2004).

25         While the facts here present far from an overwhelming case of reasonable suspicion, the

26   Court finds them sufficient under controlling Ninth Circuit precedent.  First, the tip call was

27   sufficiently reliable in that the caller gave her name, address and phone number, and described

28   present potentially unlawful conduct taking place in a two-door car across the street from the

United States District Court
Northern District of California

1    disclosed address.  Reichmuth Decl. Ex. A at 137.  While it is undisputed that the call was made

2    on a non-emergency line as opposed to a traceable 911 line, that factor does not outweigh the other

3    factors supporting the reliability of the tip.

4          Second, whether the caller reported that the people in the car "were smoking marijuana" or

5    "possibly doing HS" (which is shorthand for narcotics use in violation of the California Health and

6    Safety Code), Reichmuth Decl. Ex. A at 137, this report of specific potentially criminal activity

7    "was certainly sufficient to justify further investigation," *Williams*, 846 F.3d at 310.  Defendant

8    attempts to finely parse California's marijuana laws, suggesting that various conditions had to be

9    met for there to be reasonable suspicion to investigate potential offenses of driving under the

10   influence, possession of an open container of marijuana, or possession of more than a threshold

11   amount of marijuana.  Reply at 4-5.  Defendant's argument might have some force under the

12   probable cause standard, but it overstates what is required under the "less demanding" reasonable

13   suspicion test.  The Ninth Circuit made clear in *Williams* that an observation of "ongoing,

14   observable criminal activity" can be based on a "potential" crime (there, a trespass), as opposed to

15   requiring the sort of granular conclusive proof Defendant demands.  846 F.3d at 310; *see also*

16   *Alvarado*, 763 Fed.App'x. at 611 (concluding that officers "were not required to corroborate that

17   there was an ongoing parking violation before conducting the investigatory stop").  And within

18   seconds of the officers confirming that the occupants of the car were in fact "rolling up a blunt,"

19   Reichmuth Decl. Ex. A at 130, undisputable probable cause developed when one of the officers

20   saw a handgun in plain view under the passenger seat where Defendant was sitting.  *Id.*

21   Considering all of the facts together, the telephone tip establishes that the officers were not simply

22   acting on a "hunch" that the occupants of the car might be violating the law, and the tip was

23   adequately "reliable in its assertion of illegality, not just in its tendency to identify a determinate

24   person."  *Florida v. J.L.*, 529 U.S. at 272.

25         Last, the fact that there had been a large number of calls for service in the area further

26   contributed to the officers' reasonable suspicion.  During the two-year period ending June 18,

27   2020, SPPD received 247 calls for service in the area, with 39 calls relating to suspicious vehicles,

28   followed by 32 calls for alarms, 24 calls for service relating to a disturbance, and 18 suspicious

United States District Court
Northern District of California

1    events.  *See* Dkt. No. 34, Declaration of Tyler Hannis in Support ¶ 5.  SPPD also received seven

2    service calls for shots fired, and four for suspicious individuals.  *Id*.  Between May 2019 and

3    January 13, 2020, Officer Agredano responded to at least four calls for service in this area.

4    Agredano Decl. ¶ 10.  Between October 2018 and January 13, 2020, Officer Foster responded to

5    approximately 12 calls for service in this area.  Foster Decl. ¶ 6.

6          The reasonable inference made by the officers was that the two occupants of the Corolla

7    might be engaged in a form of criminal activity consistent with the types of conduct often reported

8    to have occurred at that location.  The officers were aware of the potential for criminal activity in

9    the area, including the use of narcotics and/or operating a vehicle while under the influence of

10   narcotics, which contributed to the existence of reasonable suspicion to approach the Corolla.

11   Agredano Decl. ¶ 8; Foster Decl. ¶ 5; *see also Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)

12   (although "[a]n individual's presence in an area of expected criminal activity, standing alone, is

13   not enough to support a reasonable, particularized suspicion that the person is committing a

14   crime," police can consider the "relevant characteristics of a location in determining whether the

15   circumstances are sufficiently suspicious to warrant further investigation"); *United States v.*

16   *Kitchen*, 11 Fed.App'x. 844, 845 (9th Cir. 2001) ("Presence in a high-crime area, by itself, is not

17   enough to create reasonable suspicion. . . .  It is, however, a permissible consideration when

18   determining whether reasonable suspicion exists.") (citations omitted).  Accordingly, while not

19   alone sufficient, the prior calls for service, including calls reporting criminal conduct in the area,

20   contributed to the officers' reasonable suspicion.  *See United States v. Sandoval*, 131 Fed.App'x.

21   614, 615-16 n.1 (9th Cir. 2005) (officers entitled to give "high-crime" area "*some* weight in

22   forming reasonable suspicion" where officers had experience in the specific area) (emphasis in

23   original).

24

25

26

27

28

IV.     CONCLUSION

Because the officers had reasonable suspicion under the totality of the circumstances to seize the Corolla long enough to conduct further investigation, the Court **DENIES** the motion to suppress.

**IT IS SO ORDERED.**

Dated:  9/3/2020

_____
HAYWOOD S. GILLIAM, JR.
United States District Judge

11